**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 19-5272

O.A., *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, AS PRESIDENT OF THE UNITED STATES, *et al.*,

*Defendants-Appellants*.

-------------------------------

*On Appeal from a Final Order of the U.S. District Court for the District of Columbia, No. 18-cv-2718-RDM (Hon. Randolph D. Moss, U.S. District Judge)*

## BRIEF OF THE OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS & AFFIRMANCE

ALICE FARMER
OFFICE OF THE UNITED
NATIONS HIGH COMMISSIONER
FOR REFUGEES
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
(202) 296-5191

PATRICK W. PEARSALL
*Counsel of Record*
TAYLOR S. WEST
ALLEN & OVERY LLP
1101 New York Ave., N.W.
Washington, D.C. 20005
(202) 683-3800

*Counsel for the Office of the United Nations
High Commissioner for Refugees*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), counsel submits the following certification:

**(A) Parties, Intervenors, and Amici.** Except for the following amici, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants: (1) the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia; (2) Peter Keisler, Carter Phillips, Stuart Gerson, John Bellinger III, Samuel Witten, Stanley Twardy, and Richard Bernstein; (3) the City of Chicago, the City of New York, the City of Oakland, and the County of Los Angeles; and (4) professors of immigration law listed on the brief filed August 3, 2020.

Amicus Curiae in support of plaintiffs is the Office of the United Nations High Commissioner for Refugees ("UNHCR"). Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, UNHCR certifies that it is not a corporation, it has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

i

**(B)  Rulings Under Review.**  References to the rulings at issue appear in the Brief for Appellants.

**(C)  Related Cases.**  This case has not previously been before this Court or any other court for appellate review.  To the best of counsel's knowledge, all references to related cases appear in the Brief for Appellants.

August 13, 2020                    /s/ Patrick W. Pearsall

PATRICK W. PEARSALL
ALLEN & OVERY LLP
1101 New York Ave., N.W.
Washington, D.C. 20005
(202) 683-3800

**CERTIFICATE OF COUNSEL AS TO SEPARATE BRIEFING**

Pursuant to Circuit Rule 29(d), I certify that it is necessary to separately file the following Brief of Amicus Curiae.  The Office of the United Nations High Commissioner for Refugees ("UNHCR") serves a special and influential role in shaping and interpreting international and domestic refugee law, which uniquely positions UNHCR to provide the Court with relevant insight, expertise, and a perspective that no other amicus curiae is capable of providing.

August 13, 2020                          /s/ Patrick W. Pearsall

                                         PATRICK W. PEARSALL
                                         ALLEN & OVERY LLP
                                         1101 New York Ave., N.W.
                                         Washington, D.C. 20005
                                         (202) 683-3800

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES .................................................................................... i

CERTIFICATE OF COUNSEL AS TO SEPARATE BRIEFING ................ iii

TABLE OF CONTENTS ................................................................ iv

TABLE OF AUTHORITIES .......................................................... v

GLOSSARY OF ABBREVIATIONS ............................................... x

INTEREST OF AMICUS CURIAE ................................................. 1

STATUTES AND REGULATIONS ................................................. 3

SUMMARY OF ARGUMENT ...................................................... 4

ARGUMENT ........................................................................... 5

  I.   The United States Is Bound by the 1951 Convention and the
      1967 Protocol .................................................................. 5

  II.  UNHCR Provides Authoritative Guidance on the Meaning of
      the 1951 Convention and the 1967 Protocol. ...................... 7

  III. The Revised Asylum Policy Is Not in Conformity with the
      United States' Obligations Under the 1951 Convention and the
      1967 Protocol .................................................................. 9

     A. *The Revised Asylum Policy Restricts the Right to Seek
        Asylum in Violation of the 1951 Convention and the 1967
        Protocol.* ................................................................. 10

     B. *The Revised Asylum Policy Creates a Penalty on Unlawful
        Entry That Is Prohibited by Article 31(1) of the 1951
        Convention.* ............................................................ 15

     C. *The Revised Asylum Policy Risks* Refoulement *of Refugees
        in Violation of Article 33(1) of the 1951 Convention.* ........... 21

     D. *Neither Withholding of Removal Under the INA Nor
        Protection Under the Convention Against Torture Is an
        Adequate Substitute for the Asylum Process.* ...................... 23

CONCLUSION ........................................................................ 26

iv

## TABLE OF AUTHORITIES

**Cases**

*Akinmade v. INS*, 196 F.3d 951 (9th Cir. 1999) ........................................... 16

*Al-Harbi v. INS*, 242 F.3d 882 (9th Cir. 2001) ............................................ 24

*Ali v. Lynch*, 814 F.3d 306 (5th Cir. 2016) .................................................... 8

*Attorney-Gen. v. Refugee Council of N.Z., Inc.*
    [2003] 2 NZLR 577 (CA) (N.Z.) ........................................................ 16

*B010 v. Canada*, [2015] 3 S.C.R. 704 (Can.) ............................................... 19

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051
    (9th Cir. 2017) (en banc) ........................................................... 7

Bundesgericht [BGer] [Federal Supreme Court]
    Mar. 17, 1999, No. 6S.737/1998, 2/1999 Asyl 21 (Switz.).............. 14, 21

*Cheng v. Attorney Gen.*, 623 F.3d 175 (3d Cir. 2010) .................................. 8

*E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d
    838 (N.D. Cal. 2018) ................................................................ 14

*Huang v. Holder*, 744 F.3d 1149 (9th Cir. 2014) .................................. 24, 25

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ........................ 1, 7, 8, 24–26

*INS v. Stevic*, 467 U.S. 407 (1984) .............................................................. 25

*Khan v. Holder*, 584 F.3d 773 (9th Cir. 2009) ........................................... 23

*Mekhoukh v. Ashcroft*, 358 F.3d 118 (1st Cir. 2004)................................... 8

*Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005) ........................... 1, 8

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019)..................................... 9

*R. v. Appulonappa* (2013), 358 D.L.R. 4th 666 (B.C. Sup. Ct.)................... 15

*R v. Asfaw* [2008] UKHL 31 (U.K.) ................................................ 16, 20, 21

*R v. Uxbridge Mags. Ct.* [1999] EWHC (Admin) 765 (Eng.)............... 15–17

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993)........................ 7, 21

*Yusupov v. Attorney Gen.*, 518 F.3d 185 (3d Cir. 2008) ............................... 7

**Statutes**

8 U.S.C. § 1231................................................................................. 23

Immigration and Nationality Act, 8 U.S.C. § 1101 et seq................. 7, 23–25

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102........................ 4, 7–9

**Other Authorities**

8 C.F.R. § 208.16 ....................................................................... 24, 25

Aliens Subject to a Bar on Entry Under Certain
    Presidential Proclamations, 83 Fed. Reg. 55,934
    (Nov. 9, 2018).................................... 2, 4, 12, 13, 17, 23, 24, 26

Anne T. Gallagher & Fiona David, The International Law of Migrant
    Smuggling 165 (2014) ............................................................... 19

Black's Law Dictionary (9th ed. 2009) ........................................... 3

Brief of UNHCR as Amicus Curiae, *INS v. Stevic*,
    467 U.S. 407 (1984) (No. 82-973)............................................ 25

Concise Oxford Dictionary 1010 (9th ed. 1995) ............................ 18

Conf. of Plenipotentiaries on the Status of Refugees & Stateless Perss.,
    U.N. Doc. A/CONF.2/SR.14 (1951) ........................................ 17

Convention Against Torture, Feb. 4, 1985, 1465
    U.N.T.S. 113 ................................................................... 23–26

Convention on the Privileges & Immunities of the United
    Nations, Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 15............ 1

Convention Relating to the Status of Refugees,
    July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ............... 2–25

vi

Cathryn Costello et al., Article 31 of the 1951
    Convention Relating to the Status of Refugees
    (UNHCR Paper No. PPLA/2017/01, 2017) ........................................... 18

Exec. Comm. of the High Comm'r's Programme,
    Note on International Protection (Submitted by
    the High Commissioner), U.N. Doc. A/AC.96/815
    (1993) ........................................................................................ 11, 21–23

Exec. Comm. of the High Comm'r's Programme, Note
    on *Non-Refoulement* (Submitted by the High
    Commissioner), U.N. Doc. EC/SCP/2 (1977) ............................. 11, 21–22

G.A. Res. 49/169 (Dec. 23, 1994) ................................................. 6

G.A. Res. 428(V), annex, UNHCR Statute (Dec. 14, 1950) ..................... 1, 7

Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention
    Relating to the Status of Refugees*, *in* Refugee
    Protection in International Law 185 (Volker Türk
    et al. eds., 2003) ................................................................ 17, 20

James C. Hathaway, The Rights of Refugees Under
    International Law (2005) ........................................ 11, 17–19, 21

Elihu Lauterpacht & Daniel Bethlehem, *The Scope &
    Content of the Principle of* Non-Refoulement, *in*
    Refugee Protection in International Law 87 (Volker
    Türk et al. eds., 2003) ....................................................... 22–23

Memorandum from the Sec'y-Gen. to the Ad Hoc Comm. on
    Statelessness, Status of Refugees & Stateless Perss.,
    U.N. Doc. E/AC.32/2 (1950) ............................................... 14, 15

Gregor Noll, *Article 31*, *in* The 1951 Convention
    Relating to the Status of Refugees & Its 1967
    Protocol: A Commentary 1243 (Andreas Zimmerman
    et al. eds., 2011) .................................................................... 20

Note, *American Courts & the U.N. High Commissioner
    for Refugees*, 131 Harv. L. Rev. 1399 (2018) ........................... 9

Presidential Proclamation 9880, 84 Fed. Reg. 21,229
    (May 8, 2019) ............................................................... 2, 4, 12–13, 17, 26

Protocol Relating to the Status of Refugees, Jan. 31, 1967,
    19 U.S.T. 6223, 606 U.N.T.S. 267 .......................... 2, 4–15, 17, 18, 24, 25

Status of Perss. Who Emigrate for Econ. Reasons Under
    the Refugee Act of 1980, 5 Op. O.L.C. 264 (1981) ................................. 9

Submission of UNHCR as Intervener, *R v. Sec'y of State*
    *for Foreign & Commonwealth Affairs* [2006] EWCA Civ
    1279 (Eng.), *reprinted in* 20 Int'l J. Refugee L. 675 (2008).................... 8

UNHCR Exec. Comm., Conclusion No. 6 (XXVIII) (1977) ...................... 23

UNHCR Exec. Comm., Conclusion No. 8 (XXVIII) (1977) ...................... 12

UNHCR Exec. Comm., Conclusion No. 15 (XXX) (1979) .................. 19, 20

UNHCR Exec. Comm., Conclusion No. 30 (XXXIV) (1983).................... 15

UNHCR Exec. Comm., Conclusion No. 58 (XL) (1979) ..................... 14, 16

UNHCR, Detention Guidelines (2012)......................................................... 15

UNHCR, Follow-Up on Earlier Conclusions of the Sub-
    Committee on the Determination of Refugee Status,
    U.N. Doc. EC/SCP/29 (1983).................................................................. 15

UNHCR, Handbook on Procedures & Criteria for Determining
    Refugee Status & Guidelines on International
    Protection, U.N. Doc. HCR/1P/4/ENG/REV.4
    (4th ed. 2019)............................................ 6, 8, 9, 11–15, 22, 24

UNHCR, Summary Conclusions on Non-Penalization
    for Illegal Entry or Presence (Mar. 15, 2017) ................................... 17, 18

UNHCR, The Principle of *Non-Refoulement* as a Norm
    of Customary International Law: Response to Questions
    Posed to UNHCR by the Federal Constitutional Court
    of the Federal Republic of Germany in Cases 2BvR
    1938/93, 2 BvR 1953/93, 2 BvR 1954/93 (Jan. 31, 1994)..................... 22

Andreas Zimmerman & Claudia Mahler, *Article 1A, Para. 2*,
    *in* The 1951 Convention Relating to the Status of
    Refugees & Its 1967 Protocol: A Commentary 281
    (Andreas Zimmerman et al. eds., 2011) .................................................. 6

# GLOSSARY OF ABBREVIATIONS

1951 Convention....................Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150

1967 Protocol.................Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267

CAT......................................Convention Against Torture, Feb. 4, 1985, 1465 U.N.T.S. 113

INA ......................... Immigration and Nationality Act, 8 U.S.C. § 1101 et seq.

Interim Asylum Rule ............ Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, 83 Fed. Reg. 55,934 (Nov. 9, 2018)

Proclamation ................ Presidential Proclamation 9880, 84 Fed. Reg. 21,229 (May 8, 2019)

Refugee Act .............. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102

UNHCR.............................................. The Office of the United Nations High Commissioner for Refugees

## INTEREST OF AMICUS CURIAE[1]

This case requires the Court to consider the lawfulness of recent and substantial changes to longstanding United States asylum law.  As the organization entrusted by the United Nations General Assembly with responsibility for providing international protection to refugees, *see* G.A. Res. 428(V), annex, UNHCR Statute ¶ 1 (Dec. 14, 1950),  the Office of the United Nations High Commissioner for Refugees ("UNHCR") has a direct interest in this matter.  Consistent with UNHCR's role and interest, the Supreme Court and lower federal courts have recognized that UNHCR provides "significant guidance" in interpreting international and domestic refugee law.  *E.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987); *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005).

UNHCR has a mandate to "[p]romot[e] the conclusion and ratification of international conventions for the protection of refugees" and to "supervis[e] their application and propos[e] amendments thereto."  UNHCR Statute ¶ 8(a).

---

[1] All parties consent to the filing of this brief provided that it is timely filed and otherwise consistent with the rules of the Court.  No person other than UNHCR and its outside counsel authored this brief in whole or in part or provided funding related to it.  This brief does not constitute a waiver, express or implied, of any privilege or immunity that UNHCR or its staff may enjoy under applicable international legal instruments or recognized principles of international law.  *See* Convention on the Privileges & Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 15.

1

Its supervisory role is also expressly provided for in two refugee conventions that apply to the United States, namely, the 1951 Convention Relating to the Status of Refugees ("1951 Convention"), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150, and the 1967 Protocol Relating to the Status of Refugees ("1967 Protocol"), Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267. *See* 1951 Convention pmbl., art. 35; 1967 Protocol art. II.

UNHCR exercises its supervisory responsibility by issuing interpretations of the 1951 Convention, the 1967 Protocol, and other international refugee instruments. It also regularly presents its opinions to national courts, including the federal courts of the United States. Those opinions are informed by UNHCR's more than six decades of experience assisting refugees and supervising the treaty-based system of refugee protection.

UNHCR submits this brief out of concern that a recent federal rule, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, 83 Fed. Reg. 55,934 (Nov. 9, 2018), when considered alongside Presidential Proclamation 9880, 84 Fed. Reg. 21,229 (May 8, 2019), reflects a substantial change to United States asylum policy that, if implemented, would be at variance with three binding international law protections: the right to seek asylum, the prohibition against penalties for irregular entry, and the principle

2

of *non-refoulement*.[2]  UNHCR has a strong interest in ensuring that United States asylum policy remains consistent with the obligations that the United States undertook when it joined the international refugee protection regime, and respectfully offers its guidance on those obligations.  Consistent with its approach in other cases, UNHCR takes no position on the merits of the underlying asylum claims of the individuals whom the plaintiffs serve.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for Appellants.

---

[2] The principle of *non-refoulement* refers to a "refugee's right not to be expelled from one state to another, esp. to one where his or her life or liberty would be threatened."  Black's Law Dictionary 1157 (9th ed. 2009).  Article 33(1) of the 1951 Convention provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

## SUMMARY OF ARGUMENT

The United States is bound by several international treaty obligations related to refugees, including those enshrined in the Protocol Relating to the Status of Refugees ("1967 Protocol"), Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, to which the United States is formally a party, and in the Convention Relating to the Status of Refugees ("1951 Convention"), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150, which is incorporated by reference in the 1967 Protocol. Essential to both treaties are core procedural and substantive rights that parties must uphold, and which, as a consequence, the United States Congress incorporated into federal statutory law through the Refugee Act of 1980 ("Refugee Act"), Pub. L. No. 96-212, 94 Stat. 102.

The Office of the United Nations High Commissioner for Refugees ("UNHCR") is concerned that a recent rule, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations ("Interim Asylum Rule"), 83 Fed. Reg. 55,934 (Nov. 9, 2018), and Presidential Proclamation 9880 ("Proclamation"), 84 Fed. Reg. 21,229 (May 8, 2019), create a new national asylum policy (the "Revised Asylum Policy") that is at odds with the United States' obligations under the 1967 Protocol and the 1951 Convention.

In particular, the Revised Asylum Policy has the effect of categorically denying the right to seek asylum to any asylum-seeker who crosses into the

United States from Mexico outside of a designated port of entry.  This blanket denial of access to the asylum process for all asylum-seekers who have crossed irregularly is at variance with three fundamental principles of binding international refugee law: the right to seek asylum; the prohibition against penalties for irregular entry, as set forth in Article 31(1) of the 1951 Convention; and the fundamental international legal principle of *non-refoulement* enshrined in Article 33(1) of the 1951 Convention.

UNHCR is concerned that if the Revised Asylum Policy were to be implemented, the United States would not be in compliance with the 1967 Protocol and the 1951 Convention.  Given its responsibility to supervise the implementation of international refugee treaties and advise parties of their duties under international refugee law, UNHCR respectfully encourages the Court to consider the United States' international law obligations when evaluating the legality of the Revised Asylum Policy and the propriety of the district court's order granting summary judgment to plaintiffs.

## ARGUMENT

### I.    The United States Is Bound by the 1951 Convention and the 1967 Protocol.

In 1950, delegates from the United States and other United Nations Member States convened to craft an agreement that would ensure that "individuals . . . are not turned back to countries where they would be exposed

to the risk of persecution."  Andreas Zimmerman & Claudia Mahler, *Article 1A, Para. 2*, *in* The 1951 Convention Relating to the Status of Refugees & Its 1967 Protocol: A Commentary 281, 337 (Andreas Zimmerman et al. eds., 2011) [hereinafter 1951 Convention Commentary].  The result was the 1951 Convention, which delineates the basic rights of refugees and asylum-seekers that parties must uphold, and which for more than six decades has served as the "cornerstone of the international system for" refugee protection.  G.A. Res. 49/169 (Dec. 23, 1994).

As the 1951 Convention primarily addressed the plight of those who fled persecution in the wake of World War II, *see* 1951 Convention art. 1(A), in 1966, the General Assembly took official notice of a second refugee treaty—the 1967 Protocol—which extended the Convention's protections to any individual unable to return to his or her country of origin on account of threatened persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion.  *See* 1967 Protocol art. I(2)–(3); Handbook on Procedures & Criteria for Determining Refugee Status & Guidelines on International Protection, U.N. Doc. HCR/1P/4/ENG/REV.4 ¶¶ 28, 34–35 (4th ed. 2019) [hereinafter Handbook].

Nearly 150 parties, including the United States, have acceded to the 1967 Protocol.  As Article I(1) of the 1967 Protocol binds parties to Articles

2 through 34 of the 1951 Convention, by ratifying the Protocol the United States agreed to comply with all of the "substantive provisions" of the 1951 Convention. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 169 n.19 (1993).

To implement the United States' commitments under the 1951 Convention and 1967 Protocol into domestic statutory law, Congress passed the Refugee Act, which amended the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., to bring "United States refugee law into conformance" with both treaties. *Cardoza-Fonseca*, 480 U.S. at 436. "The legislative history of the Refugee Act . . . makes clear that Congress intended to protect refugees to the fullest extent of [the United States'] international obligations," rendering the scope and meaning of those obligations relevant to any interpretation of the INA's asylum provisions. *Yusupov v. Attorney Gen.*, 518 F.3d 185, 203 (3d Cir. 2008) (footnote omitted); *accord, e.g.*, *Cardoza-Fonseca*, 480 U.S. at 436–38; *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060–61 (9th Cir. 2017) (en banc).

## II.    UNHCR Provides Authoritative Guidance on the Meaning of the 1951 Convention and the 1967 Protocol.

UNHCR has a mandate to supervise the application of international conventions for the protection of refugees, including the 1951 Convention and the 1967 Protocol. G.A. Res. 428(V), annex, UNHCR Statute ¶ 8(a) (Dec. 14,

1950).  In language initially proposed by the United States, both treaties specifically acknowledge UNHCR's supervisory role.  1951 Convention pmbl., art. 35; 1967 Protocol art. II; *see* Submission of UNHCR as Intervener ¶ 89, *R v. Sec'y of State for Foreign & Commonwealth Affairs* [2006] EWCA Civ 1279 (Eng.), *reprinted in* 20 Int'l J. Refugee L. 675, 697 (2008).

UNHCR exercises its supervisory responsibility in part by issuing interpretive guidance concerning the 1951 Convention and its 1967 Protocol. Chief among these interpretations is UNHCR's *Handbook*, which UNHCR first drafted in 1979, and which sets forth authoritative guidance on the 1951 Convention and 1967 Protocol.

The Supreme Court and lower federal courts have recognized that the *Handbook* and UNHCR's other interpretations provide "significant guidance" in construing the 1951 Convention and the 1967 Protocol, as well as the Refugee Act that implemented them into domestic law.  *E.g.*, *Cardoza-Fonseca*, 480 U.S. at 436–39, 439 n.22; *Ali v. Lynch*, 814 F.3d 306, 314 n.7 (5th Cir. 2016); *Cheng v. Attorney Gen.*, 623 F.3d 175, 193 & n.13 (3d Cir. 2010); *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005); *Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 & n.6 (1st Cir. 2004).  That is because "Congress was aware of the criteria articulated in the Handbook when it passed the [Refugee] Act in 1980, and . . . it is [thus] appropriate to consider

the guidelines in the Handbook as an aid to the construction of the Act."
Status of Perss. Who Emigrate for Econ. Reasons Under the Refugee Act of
1980, 5 Op. O.L.C. 264, 266 (1981) (Theodore B. Olson); *see also* Note,
*American Courts & the U.N. High Commissioner for Refugees*, 131 Harv. L.
Rev. 1399, 1419 (2018) (observing that "UNHCR was already engaged in
monitoring and interpretive activities at the time that the United States joined
the international refugee regime by signing the [1967] Protocol").

### III.    The Revised Asylum Policy Is Not in Conformity with the United States' Obligations Under the 1951 Convention and the 1967 Protocol.

The 1951 Convention and 1967 Protocol set forth several procedural
and substantive rights for refugees that states are bound to respect and uphold.
Chief among these are three core safeguards—the right to seek asylum,
protection against penalties for illegal entry, and protection against
*refoulement*—that ensure asylum-seekers' safety and are thus critical to
refugees' full enjoyment of the other rights guaranteed by the 1951
Convention and 1967 Protocol.  *See* Handbook at 1, ¶¶ 189–90.  The Revised
Asylum Policy, which effectively renders aliens "ineligible for asylum if they
enter the United States from Mexico outside a designated port of entry," *O.A.
v. Trump*, 404 F. Supp. 3d 109, 117 (D.D.C. 2019), is at variance with these
three fundamental protections.

9

First, the Revised Asylum Policy's categorical denial of asylum to an entire class of asylum-seekers is at odds with the United States' obligation under the 1951 Convention and 1967 Protocol to provide *all* asylum-seekers with a fair and efficient process for establishing their refugee status. Second, the basis of that denial—irregular border-crossing—is inconsistent with Article 31(1) of the 1951 Convention, which, in order to protect refugees' fundamental rights, prohibits states from imposing penalties on account of irregular entry. Third, the Policy is likely to result in the *refoulement* of some of the asylum-seekers who are categorically barred from obtaining asylum within the United States, a result that violates the prohibition on returning refugees to persecution that is enshrined in Article 33(1) of the 1951 Convention.

### A. The Revised Asylum Policy Restricts the Right to Seek Asylum in Violation of the 1951 Convention and the 1967 Protocol.

The 1951 Convention and 1967 Protocol define who is a refugee without reference to whether an individual has been officially recognized as such. A person is a refugee, and entitled to the protections that come with that status, if he or she is outside his or her country and unable to return on account of a "well-founded fear" of persecution "for reasons of race, religion, nationality, membership of a particular social group or political opinion."

10

1967 Protocol art. I(2)–(3); 1951 Convention art. 1(A)(2).  In other words, a grant of asylum or refugee status does not make a person a refugee, but rather formally recognizes that the person is a refugee.  Handbook ¶ 28.

The 1951 Convention and 1967 Protocol's extension of protection to refugees who have not received formal recognition of their status necessarily requires a process for identifying refugees among asylum-seekers.[3] Handbook ¶ 189; Exec. Comm. of the High Comm'r's Programme, Note on International Protection (Submitted by the High Commissioner) ¶ 11, U.N. Doc. A/AC.96/815 (1993) [hereinafter Note on International Protection]. That process must meet basic due process requirements, chief among which, in the absence of a group-based protection process, is an individualized examination of whether each asylum-seeker meets the definition of a refugee

---

[3] As discussed below, the obligation to protect unrecognized refugees also requires the extension of certain basic rights under the 1951 Convention and 1967 Protocol, including the prohibition against penalties for irregular entry and the principle of *non-refoulement*, to every asylum-seeker until he or she is determined, through a fair process, not to be a refugee.  *See* Exec. Comm. of the High Comm'r's Programme, Note on *Non-Refoulement* (Submitted by the High Commissioner) ¶ 19, U.N. Doc. EC/SCP/2 (1977); James C. Hathaway, The Rights of Refugees Under International Law 389 & n.491 (2005).

set forth in the 1951 Convention and 1967 Protocol.[4]  *See* Handbook ¶¶ 44,

192; UNHCR Exec. Comm., Conclusion No. 8 (XXVIII) ¶ (e) (1977).[5]

The Revised Asylum Policy falls short of this individualized

determination requirement because the Policy effectively closes the asylum

process to all asylum-seekers who cross the United States' southern border

irregularly: the Proclamation suspends the right of entry to "any alien into the

United States across the international boundary between the United States and

Mexico" and exempts only lawful permanent residents and "alien[s] who

enter[] the United States at a port of entry and properly present[] for

inspection."  84 Fed. Reg. at 21,230.  The Interim Asylum Rule makes aliens

categorically ineligible for asylum if they are "subject to a presidential

proclamation" that "suspend[s] or limit[s] the entry of aliens along the

southern border with Mexico."  83 Fed. Reg. at 55,952.  This blanket denial

---

[4] "[R]efugee status must normally be determined on an individual basis . . . ." Handbook ¶ 44.  Although parties may grant refugee status to groups of individuals in urgent circumstances where it is "not . . . possible for purely practical reasons to carry out an individual determination . . . for each member of the group," *id.*, this allowance for group-based *protection* does not permit states to *deny* refugee status to groups of individuals without some individualized consideration.

[5] UNHCR's Executive Committee Conclusions are adopted by consensus by the states that comprise the Executive Committee.  The Conclusions reflect these states' understanding of legal standards regarding the protection of refugees.  At present, 102 states are members of the Executive Committee; the United States has been a member since 1951.

of asylum process fails to provide a whole group of asylum-seekers with any individualized process for establishing their refugee status and entitlement to asylum, and goes well beyond the specific and limited exclusions to entitlement to refugee protection enumerated in the 1951 Convention.[6]

UNHCR recognizes that under the Revised Asylum Policy, asylum-seekers would retain access to asylum process if they are able to enter the United States from Mexico at a designated port of entry. *See* Proclamation, 84 Fed. Reg. at 21,230. However, neither the 1951 Convention nor the 1967 Protocol permits parties to condition access to asylum procedures on regular entry.

Many refugees cannot satisfy regular exit and entry requirements and have no choice but to cross into a safe country irregularly prior to making an asylum claim. *See* Memorandum from the Sec'y-Gen. to the Ad Hoc Comm.

---

[6] Although the 1951 Convention foresees that some individuals may be excluded from refugee protection in exceptional circumstances, the Revised Asylum Policy does not conform to the specific, limited restrictions that the 1951 Convention allows. Under the 1951 Convention, states are to deny refugee protection to individuals who have committed heinous acts or serious common crimes—and they may deny protection from *refoulement* to individuals who pose a "danger to the security of the country in which" they are in and to individuals "who, having been convicted by a final judgment of a particularly serious crime, constitute[] a danger to the community of that country." 1951 Convention arts. 1(F), 33(2). These exclusions require individualized assessments and "must be [interpreted] restrictive[ly]." Handbook ¶ 149.

13

on Statelessness, Status of Refugees & Stateless Perss. annex art. 24 cmt. ¶ 2,

U.N. Doc. E/AC.32/2 (1950) [hereinafter Memorandum from the Secretary-

General]; UNHCR Exec. Comm., Conclusion No. 58 (XL) ¶ (i) (1979).[7]  For

this reason, the fair and efficient asylum process that the 1951 Convention and

1967 Protocol demand must allow for the possibility that refugees will need

to cross borders irregularly.  *See* Handbook ¶ 190; Memorandum from the

Secretary-General annex art. 24 cmt. ¶ 2.

UNHCR appreciates the fact that states face operational demands to

manage their borders efficiently and acknowledges that, with adequate

safeguards, parties may impose procedural requirements, such as claim-

processing rules, on asylum applications.  However, UNHCR has serious

concerns about the categorical closing of the asylum process envisioned by

the Revised Asylum Policy.  Parties may not use border management as a

means to deter refugees from seeking asylum or to deny protection to whole

---

[7] UNHCR also notes that it may be difficult or impossible for some asylum-seekers who would ordinarily be able to register asylum claims at ports of entry to do so due to the "lengthy delays" for asylum processing that have existed at border checkpoints along the United States' southern border.  *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 851 (N.D. Cal. 2018); *see also* Bundesgericht [BGer] [Federal Supreme Court] Mar. 17, 1999, No. 6S.737/1998, 2/1999 Asyl 21, 21–23 (Switz.) (explaining that a refugee has particularly "compelling reasons for illegal entry" if he has "genuine[] fears" that he will be denied regular admission to a state that can guarantee his safety (transl. of counsel)).

classes of asylum-seekers, as many individual class members will have valid

claims to protection as refugees under the 1951 Convention and 1967

Protocol.[8] *See, e.g.*, Handbook ¶¶ 44, 189; UNHCR, Detention Guidelines 19

¶ 32 (2012).

### B. The Revised Asylum Policy Creates a Penalty on Unlawful Entry That Is Prohibited by Article 31(1) of the 1951 Convention.

Refugees are "rarely in a position to comply with the requirements for

legal entry." Memorandum from the Secretary-General annex art. 24 cmt. ¶

2; *accord R. v. Appulonappa* (2013), 358 D.L.R. 4th 666, paras. 59–60 (B.C.

Sup. Ct.), *aff'd*, [2015] 3 S.C.R. 754 (Can.); *R v. Uxbridge Mags. Ct.* [1999]

EWHC (Admin) 765, [1] (Brown LJ) (Eng.). Given that they are fleeing

persecution and do not have the protection of their home state, refugees may

---

[8] UNHCR also recognizes that asylum screening procedures "may usefully include special provision for dealing in an expeditious manner with applications" that are "clearly abusive" or "manifestly unfounded." UNHCR Exec. Comm., Conclusion No. 30 (XXXIV) ¶ (d) (1983). However, due to "the grave consequences of an erroneous determination," any procedure for disposing of abusive applications must be "accompanied by appropriate procedural guarantees," *id.* ¶ (e), and "no application [may] be treated as manifestly unfounded or abusive unless its fraudulent character or its lack of any connection with the relevant criteria is truly free from doubt," UNHCR, Follow-Up on Earlier Conclusions of the Sub-Committee on the Determination of Refugee Status ¶ 19, U.N. Doc. EC/SCP/29 (1983). As the Revised Asylum Policy implements a blanket denial of asylum without any individualized examination of the merits of asylum claims, it cannot be justified by any allowance for screening procedures for abusive applications.

lack "appropriate documentation" for exit and entry or may need to evade the detection of authorities or other persecutors, and must therefore resort to "cross[ing] borders clandestinely in order to access protection." *Attorney-Gen. v. Refugee Council of N.Z., Inc.* [2003] 2 NZLR 577 at [6] per Tipping J. (CA) (N.Z.); *R v. Asfaw* [2008] UKHL 31, [51] (Lord Hope of Craighead) (U.K.); UNHCR Exec. Comm., Conclusion No. 58 (XL) ¶ (i) (1979); *accord Akinmade v. INS*, 196 F.3d 951, 955 (9th Cir. 1999) ("[W]e recognize that a genuine refugee escaping persecution may lie about his citizenship to immigration officials in order to flee his place of persecution . . . .").

Given that a "quest for asylum" can "reasonably involve[] . . . breaching the law," *Uxbridge Mags. Ct.* [1999] EWHC (Admin) 765, [15]–[16] (Brown LJ), Article 31(1) restricts parties' ability to penalize asylum-seekers for crossing borders irregularly:

> The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

16

1951 Convention art. 31(1).[9]  The provision's drafting history makes clear that "[t]he fact that a refugee was fleeing from persecution was [in of itself] good cause" for illegal entry.  James C. Hathaway, The Rights of Refugees Under International Law 393 (2005) (alterations in original) (quoting Conf. of Plenipotentiaries on the Status of Refugees & Stateless Perss., U.N. Doc. A/CONF.2/SR.14 (1951) (Statement of Mr. Hoare of the United Kingdom)); UNHCR, Summary Conclusions on Non-Penalization for Illegal Entry or Presence 7 ¶ 18 (Mar. 15, 2017) [hereinafter Summary Conclusions on Non-Penalization].

The Revised Asylum Policy is inconsistent with Article 31(1) because it imposes a penalty on asylum-seekers for the sole reason that they entered the United States irregularly.  *See* Proclamation, 84 Fed. Reg. at 21,230; Interim Asylum Rule, 83 Fed. Reg. at 55,952.  UNHCR is particularly troubled by the nature of the penalty imposed—the categorical denial of

---

[9] Consistent with the broad definition of refugee in the 1951 Convention and 1967 Protocol, *see supra* pp. 10–11, the drafting history confirms that Article 31(1) was intended to protect "all persons who claim refugee status, until and unless they are finally determined not to be Convention refugees."  Hathaway, *supra*, at 389; *accord, e.g.*, *Uxbridge Mags. Ct.* [1999] EWHC (Admin) 765, [16] (Brown LJ); UNHCR, Summary Conclusions on Non-Penalization for Illegal Entry or Presence 4 ¶ 7 (Mar. 15, 2017); Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of Refugees*, *in* Refugee Protection in International Law 185, 193 (Volker Türk et al. eds., 2003).

17

asylum process—as its imposition will likely result in the return of some refugees to countries where they will be persecuted.

It makes no difference that the Revised Asylum Policy's blanket denial of asylum could be classified as a civil or administrative penalty rather than a criminal one; UNHCR's view is that the concept of impermissible "penalties" in Article 31(1) encompasses civil or administrative penalties as well as criminal ones. Importantly, Article 31(1) does not distinguish between civil and criminal penalties. Its unqualified use of the word "penalty" refers to any "loss inflicted for violation of a law," not merely those that are criminal in nature. Hathaway, *supra*, at 410 (citing Concise Oxford Dictionary 1010 (9th ed. 1995)); Summary Conclusions on Non-Penalization at 7 ¶ 19; Cathryn Costello et al., Article 31 of the 1951 Convention Relating to the Status of Refugees 32–33 (UNHCR Paper No. PPLA/2017/01, 2017).

Moreover, the purpose of the 1951 Convention and 1967 Protocol is to ensure that all refugees can gain access to international protection. Summary Conclusions on Non-Penalization at 2 ¶ 2. Accordingly, the term "penalties" in Article 31(1) should be interpreted in a manner that protects, rather than prevents, refugees' access to asylum. *Id.*; Costello et al., *supra*, at 32. A protective reading of the language of Article 31(1) also accords with Article 31(1)'s drafting history, which shows that the provision's framers abandoned

a "narrow construction of the notion of" penalties included in the original draft and adopted a United States proposal to prohibit *any* penalties imposed on refugees due to their unlawful entry. Hathaway, *supra*, at 408–10.

Accordingly, Article 31(1)'s import "for domestic admissibility provisions is clear. . . . '[A]n individual cannot be denied refugee status—or, most important, the opportunity to make a claim for such status through fair assessment procedures—solely because of the way in which that person sought or secured entry into the country of destination.'" *B010 v. Canada*, [2015] 3 S.C.R. 704, 729 (Can.) (quoting Anne T. Gallagher & Fiona David, The International Law of Migrant Smuggling 165 (2014)).

Nor does it make a difference that some of the refugees affected by the Revised Asylum Policy have transited through other countries, such as Mexico, on their way to seek protection in the United States. Although Article 31(1) protects only refugees who "com[e] directly" from a jurisdiction where they faced persecution on account of a protected ground, this limiting language "does not disfranchise" refugees who have "passed through, or even [have] been provisionally admitted to, another country."[10] Hathaway, *supra*,

---

[10] There is no obligation under international law for a person to seek asylum at the first effective country, and "asylum should not be refused solely on the ground that it could be sought from another State." UNHCR Exec. Comm., Conclusion No. 15 (XXX) ¶ (h)(iv) (1979).

at 396; Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of Refugees*, *in* Refugee Protection in International Law 185, 217–18 (Volker Türk et al. eds., 2003); UNHCR Exec. Comm., Conclusion No. 15 (XXX) ¶ (h)(iii) (1979).  Rather, it simply permits penalties on refugees who have already sought and found asylum in a safe third country and later cross into another state irregularly.  Gregor Noll, *Article 31*, *in* 1951 Convention Commentary at 1243, 1257; Goodwin-Gill, *supra*, at 218.

This reading of Article 31(1)'s "coming directly" language is well supported by Article 31(1)'s drafting history.  As the House of Lords described that history, "there was universal acceptance [among the drafters] that the mere fact that refugees stopped while in transit ought not deprive them of the benefit of the article."  *Asfaw* [2008] UKHL 31, [56] (Lord Hope of Craighead).  Moreover, a more expansive reading of the "coming directly" language would overlook the provision's functional role in supporting the architecture of the 1951 Convention.  Article 31(1) helps to implement one of the core lessons from the interwar period—the importance of "international co-operation" in ensuring that no one country is forced to bear an "unduly heavy burden[]" that could prompt the closing of borders to refugees.  1951 Convention pmbl.; *see* Noll, *supra*, at 1256.

20

In short, though Article 31(1) might not preclude penalization of individuals who have spent significant time in a third country of refuge, its provisions were "intended to apply, and ha[ve] been interpreted to apply, to persons who have briefly transited other countries." *Asfaw* [2008] UKHL 31, [19], [50] (Lord Hope of Craighead) (quoting *Summary Conclusions: Article 31 of the 1951 Convention*, *in* Refugee Protection in International Law, *supra*, at 253, 255); *accord, e.g.*, Bundesgericht [BGer] [Federal Supreme Court] Mar. 17, 1999, No. 6S.737/1998, 2/1999 Asyl 21, 21–23 (Switz.); Hathaway, *supra*, at 396.

### C. The Revised Asylum Policy Risks Refoulement of Refugees in Violation of Article 33(1) of the 1951 Convention.

Article 33(1) of the 1951 Convention prohibits parties from "expel[ling] or return[ing] ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 1951 Convention art. 33(1).  The article has a broad reach, applying both within a state's territory and at its border, *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 180–82 (1993), and to recognized refugees and asylum-seekers whose status has not yet been determined, Note on International Protection ¶ 11; Exec. Comm. of the High Comm'r's Programme, Note on *Non-Refoulement* (Submitted by the High

21

Commissioner) ¶ 19, U.N. Doc. EC/SCP/2 (1977); Elihu Lauterpacht & Daniel Bethlehem, *The Scope & Content of the Principle of* Non-Refoulement, *in* Refugee Protection in International Law, *supra*, at 87, 116–18.

The importance of *non-refoulement* cannot be overstated.  It is "the cornerstone of asylum and of international refugee law," Note on International Protection ¶ 10, and one of the core principles of the 1951 Convention, Handbook at 1.  As the High Commissioner has explained, "[i]t would be patently impossible to provide international protection to refugees if States failed to respect this paramount principle of refugee law and of human solidarity."   Note on International Protection ¶ 10.   Importantly, *non-refoulement* is recognized as a principle of customary international law.  *See* UNHCR, The Principle of *Non-Refoulement* as a Norm of Customary International Law: Response to Questions Posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in Cases 2BvR 1938/93, 2 BvR 1953/93, 2 BvR 1954/93 ¶ 5 (Jan. 31, 1994); Lauterpacht & Bethlehem, *supra*, at 149–63.

UNHCR is concerned that the Revised Asylum Policy does not comply with Article 33(1)'s prohibition against *refoulement*.   By categorically denying aliens the right to seek asylum for the sole reason that they have

22

crossed into the United States irregularly, the Policy places individuals with valid asylum claims at risk of deportation to the very states they have sought to escape. Such a return to persecution is forbidden by Article 33(1) and is inconsistent with the "international community['s commitment] to ensure to [all] those in need of protection the enjoyment of fundamental human rights, including the rights to life . . . and to liberty and security of [the] person."[11] Note on International Protection ¶ 10; UNHCR Exec. Comm., Conclusion No. 6 (XXVIII) ¶¶ (a)–(c) (1977).

### D. Neither Withholding of Removal Under the INA Nor Protection Under the Convention Against Torture Is an Adequate Substitute for the Asylum Process.

The Interim Asylum Rule purports to be consistent with the United States' international law obligations because it does not deny any alien the right to apply for withholding of removal under the INA, *see* 8 U.S.C. § 1231(b)(3)(A), or the protection afforded by regulations that implement the

---

[11] Article 33(2)—along with the INA—does create narrow exceptions to Article 33(1)'s prohibition against *refoulement*, providing that the "benefit of [Article 33(1)] may not . . . be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community." 1951 Convention art. 33(2); *Khan v. Holder*, 584 F.3d 773, 777 (9th Cir. 2009). However, as noted above, a state relying on Article 33(2) must determine on an *individualized* basis whether a refugee falls into one of the exceptions. *See supra* note 6; Lauterpacht & Bethlehem, *supra*, at 136–37.

Convention Against Torture ("CAT"), Feb. 4, 1985, 1465 U.N.T.S. 113; 8 C.F.R. § 208.16(c). *See* Interim Asylum Rule, 83 Fed. Reg. at 55,938–39. However, UNHCR is concerned that withholding of removal under the INA and protection under CAT do not provide an adequate substitute for the asylum procedures required by the 1951 Convention and 1967 Protocol and do not extend all rights articulated in the treaties.

Most importantly, withholding of removal and protection under CAT are not available to all refugees. To prove entitlement to withholding of removal under the INA, an applicant "must demonstrate that it is more likely than not that he would be subject to persecution" in his country of origin. *Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014) (quoting *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001)). By contrast, an alien is entitled to asylum if he makes the lesser showing of a well-founded fear of persecution, which requires establishing "to a reasonable degree, that his continued stay in his country of origin has become intolerable to him for the reasons stated in the definition [of a refugee] or would for the same reasons be intolerable if he returned there." *Cardoza-Fonseca*, 480 U.S. at 439–40 (quoting Handbook ¶ 42). Accordingly, under the Revised Asylum Policy, a refugee who can demonstrate a "well-founded fear of persecution" may nonetheless be denied even the most basic rights that come with asylum under the 1951 Convention

24

and 1967 Protocol, including protection from *refoulement*, if he or she cannot also surmount the "higher" bar for entitlement to withholding of removal.[12] *Huang*, 744 F.3d at 1152.

CAT protections are also not available to all refugees who would otherwise qualify for asylum. Under United States law, an alien is entitled to protection under CAT only if he or she proves that "it is more likely than not that he or she would be tortured if removed." 8 C.F.R. § 208.16(c)(2). Like the standard for withholding of removal, this preponderance standard is more difficult to meet than the international law standard for asylum: "to show a 'well-founded fear of persecution,' an alien need *not* prove that it is more likely than not that he or she will be persecuted in his or her home country."

---

[12] UNHCR recognizes that in *INS v. Stevic*, 467 U.S. 407 (1984), the Supreme Court held that withholding of removal—the INA's codification of Article 33(1)'s *non-refoulement* principle—is available to only those who can prove that it is more likely than not that they will be persecuted on removal. *Id.* at 429–30. UNHCR's position is that Article 33(1) of the 1951 Convention prohibits the *refoulement* of any individual who can make the lesser showing of a "well-founded fear of persecution." *See generally* Brief of UNHCR as Amicus Curiae at 12–29, *Stevic*, 467 U.S. 407 (No. 82-973). Even if Article 33(1) were to allow for the preponderance standard adopted in *Stevic*, withholding of removal would still be an inadequate substitute for the asylum process, as asylum is available to all individuals who can make the lesser showing of a "well-founded fear of persecution," even if they cannot satisfy the *Stevic* standard. *Cardoza-Fonseca*, 480 U.S. at 430–32. Accordingly, *Stevic* cannot justify the Revised Asylum Policy's withdrawal of the right to seek asylum, or the Policy's penalization of refugees for irregular entry. *See supra* § III(A)–(B).

*Cardoza-Fonseca*, 480 U.S at 449 (emphasis added).  Moreover, because of their focus on torture, statutory CAT protections may be unavailable for refugees facing persecution on a protected ground if the persecution does not qualify as torture under federal law, even if it entails serious violations of human rights.

## CONCLUSION

UNHCR is concerned that the Revised Asylum Policy reflected in the Interim Asylum Rule and Proclamation is at variance with the United States' obligations under international law, and respectfully requests the Court to consider those obligations when evaluating the legality of the Policy and the propriety of the district court's order granting summary judgment to plaintiffs.

Dated:  August 13, 2020                    Respectfully submitted,


                                           /s/ Patrick W. Pearsall

ALICE FARMER                               PATRICK W. PEARSALL
OFFICE OF THE UNITED                       *Counsel of Record*
NATIONS HIGH COMMISSIONER                  TAYLOR S. WEST
FOR REFUGEES                               ALLEN & OVERY LLP
1800 Massachusetts Ave., N.W.              1101 New York Ave., N.W.
Washington, D.C. 20036                     Washington, D.C. 20005
(202) 296-5191                             (202) 683-3800

*Counsel for the Office of the United Nations*
*High Commissioner for Refugees*

26

**CERTIFICATE OF COMPLIANCE**

I certify that, pursuant to Federal Rules of Appellate Procedure 29 and 32, the foregoing Brief of Amicus Curiae is printed in a proportionally spaced, serif typeface of 14-point, and contains 6,036 words, excluding words in sections identified as exempted in Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

August 13, 2020

/s/ Patrick W. Pearsall

PATRICK W. PEARSALL
ALLEN & OVERY LLP
1101 New York Ave., N.W.
Washington, D.C. 20005
(202) 683-3800

## CERTIFICATE OF SERVICE

I certify that on August 13, 2020, I caused the foregoing Brief of Amicus Curiae to be filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. Counsel in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

August 13, 2020

/s/ Patrick W. Pearsall

PATRICK W. PEARSALL
ALLEN & OVERY LLP
1101 New York Ave., N.W.
Washington, D.C. 20005
(202) 683-3800